JAMES S. SMITH, Respondent, *v.* THOMAS W. B. CREWS, Appellant.

### May 16, 1876.

1. Gross misconduct of a financial agent, in the matter of keeping accounts, forfeits all right to compensation.

2. Where a referee finds as a fact that a financial agent has grossly neglected his duty by failure to keep proper accounts and vouchers, it is error to allow him his salary.

APPEAL from St. Louis Circuit Court.
*Reversed and remanded.*

*W. C. Bragg,* for appellant, cited : Ely *v.* Ownby, 59 Mo. 437.

*G. W. Bailey,* for respondent, cited : W. B. Benevolent

Assn. *v.* Kribben, 48 Mo. 37 ; Frang *v.* Dietrick, 49 Mo. 95 ; Maguire *v.* McCaffrey, 24 Mo. 552 ; 2 Pars. on Con. (5th ed.) 528.

BAKEWELL, J., delivered the opinion of the court.

This is an action on a written contract. In the first count of his petition plaintiff claims a balance of $359 for wages due him, under the contract, as master of the steamboat "Evening Star." In the second count plaintiff claims $4,155 for moneys advanced by him, according to the terms of the contract, for the benefit of defendants, for supplies, materials, and labor furnished to the boat, according to an itemized account filed with the petition.

Defendant Crews (the only defendant who appeals) files a separate answer, in which he denies all indebtedness ; charges that plaintiff received and retained $45,000 of money belonging to defendants, as owners of the boat ; that he refuses to account, and withholds papers and vouchers of the boat, and has now in his hands large sums, amounting altogether to $50,000, belonging to the defendants ; and prays for an account.

The replication denies the new matter in the answer, and states that the receipts of the boat, whilst in plaintiff's charge, exceeded her earnings.

The case was referred, by consent, to a referee, who reports that neither plaintiff nor defendant are entitled to recover anything on balance of the boat's accounts, and that plaintiff is entitled to recover $359, the balance claimed by him for his services as captain of the "Evening Star."

Exceptions were filed to the report of the referee, which were overruled, and, a motion for a new trial having been filed and overruled, the cause is brought to this court by appeal.

The grounds of exception to the report are :

1. "That the referee erred in overruling the motion of defendants to require plaintiff to render an account of the boat."

2. " That the referee erred in allowing plaintiff the wages claimed, as they were provided for in the written contract, and could not be separated from it."

Under this head the exceptor sets up that the grossly unfair dealing of plaintiff, in the matter of his accounts with defendants, as shown in the evidence, is a sufficient ground for disallowing his claim for wages.

1. The referee reports that he finds it impossible to determine, from the mass of contradictory testimony before him, which party is here bound to account to the other. There was some evidence that plaintiff was for a time driven from the boat, and the books taken from his possession. From the vouchers, letters, books, and testimony of experts before him, the referee states that he finds it impossible to state an account between the parties.

We cannot, under the circumstances, say that the referee committed an error in law in not requiring the plaintiff to render an account of the affairs of the boat, since an account, for whatever reason, had become, he says, impossible.

2. Whether, under the written agreement between plaintiff and defendants, the accounting for and paying over to the defendants, by plaintiff, the moneys received by him for them was a condition precedent to his recovery in this case, is a question that we cannot determine with absolute satisfaction to ourselves, owing to the state of the record. Though this is a suit on a written contract, and the contract itself is material to the determination of this question, error has been assigned on one side, and a joinder filed on the other, without any examination, apparently, of the record itself; for the page on which the contract between the parties should appear is left entirely blank, except for the title of the paper. However, as no words in a contract necessarily make a condition precedent, and as the intention of the parties, to be gathered from the whole instrument, is probably correctly set out in the pleadings, and in the statement of the contract made by the referee in his special findings, this

is not, perhaps, after all, a matter of very great importance. It sufficiently appears that plaintiff was hired as master of the boat, at a certain monthly salary; that he was to pay a certain indebtedness of the boat, for which he was to be reimbursed, with 10 per cent. interest; that he was to manage the financial affairs of the boat, and account to defendants, her owners. This seems to have been the substance of the agreement between the parties, and proof of his performance of his duty in this respect cannot be held, under such an agreement, an indispensable prerequisite to the recovery of his salary, or of any part of it. The breach of the stipulation to account gives a right of action to the injured party; but the conditions were distinctly separable, so that much of what was agreed to be done could be performed on both sides as if the condition was not there; and this is laid down as the test of independent covenants. When the covenants are mutual, but independent, one party may maintain an action on the covenant to be performed by the other, without averring performance of the contract on his own part. The law has no preference for one kind of a contract over another, and will not make an independent covenant by implication or intendment. 6 Gray, 121; Willes, 157. We see nothing, then, in the contract, as presented to us by this record, which enables us to declare, as a matter of law, that the accounting required in the agreement was in such a sense a condition precedent to recovery by plaintiff; that, until the referee had found as an affirmative fact that plaintiff had accounted according to the contract, he could not allow to plaintiff any amount that might appear to be due as wages under the agreement.

3. Nevertheless, cases constantly occur of such gross neglect and misconduct by agents, in the matter of keeping accounts and vouchers, and managing financial affairs intrusted to them, as to amount to a complete forfeiture of all compensation. The report of the referee in this case shows that he finds from the evidence a state of facts to have

existed such as to make it clear to us, as a matter of law, that the plaintiff was entitled to no compensation for his services. We quote from the referee's report:

"The testimony introduced by defendant tends to show that the books, as originally kept, would not show the true condition of the boat's accounts. Majors, one of the clerks, in his deposition, says plaintiff depended on him to keep his accounts of cash, and this could not be done, owing to the manner in which plaintiff kept his business. He says it was impossible to tell whether the bills and expenses of the boat were correct or not. Witness made his entries partly from his own knowledge, partly from what plaintiff told him. He says the books did not show the entire transactions of the boat. 'I can't tell,' he testifies, 'by the books, whether the owners of the boat owe Smith $3,000, or whether Smith owes the owners of the boat $3,000, as there were other transactions between them that were never put down, that the books don't show.'

"In point of fact it appears, from Smith's own testimony —and much stress is laid by him upon the fact—that the moneys paid out by him from his own private funds, and which he claims in this suit, were not entered upon the books of the boat at all. He makes frequent reference to a private memorandum-book—a black book which he says was left on the boat at Sioux City—which showed his private disbursements for the boat. It was kept by Majors and McFarland, in the clerk's office of the steamer. McFarland had charge of it. The entries in it, he testifies, were made up from vouchers. The payments drawn from Smith's private funds, for fuel, wages, etc., were not entered up under their appropriate heads in the books, because, by the terms of his contract, he was not required to so enter them. He swears that he had no debit and credit account with the boat, except for his own wages as captain. So it appears from his own testimony that, as to the disbursements claimed in this suit, the regular books of the steamer, if in evidence,

would show nothing. As to this memorandum or black book, which was kept for plaintiff by the clerks, plaintiff says it was left on the boat at Sioux City. Defendant Crews, *contra*, says he never saw or heard of it. Majors, the clerk, testifies to a similar purport.

"It must be remembered, as a circumstance not favorable to plaintiff, that he kept no regular account of debit and credit, with defendant, on the books of the steamer, open to the inspection and examination of the owners. Such accounts most especially, it would seem, should be handed over to the owners, for examination, at the end of each trip, or, at all events, should be kept where they might be over-hauled, instead of being kept in a pocket memorandum-book, where neither Crews nor the clerks, so far as it appears, ever heard of it.

"Plaintiff introduced a large number of vouchers, showing disbursements out of his own resources, for the boat, which, he says, furnishes the basis for the entries on the black book. The payments attested by them, in a number of instances, Crews says he paid himself. But, supposing them to be correct, they furnish only one side of the account. Plaintiff is shown to have had charge of the funds collected as well as paid out. What accounts are furnished of them? His testimony is that money taken in by him was regularly entered on the books of the boat, and that his vouchers, supplemented by the regular books, would show everything.

"But the books, in the view we take of the case, cannot be evidence. Majors can't tell anything from the books, as there were transactions between the parties not entered up in them, and it is not made to appear that the items left out were placed in the black book. So, in attempting to arrive at a result, from the books, in New Orleans, after the Red river trip, Smith made out two statements, about $900 apart, and Crews says the lesser estimate was over $100 out of the way. Again, at the Sioux City estimate, the computations differed widely. It would seem as though,

if the books were in evidence, they would throw no very satisfactory light on the financial situation of the steamer.

" But an effort has been made, on the part of plaintiff, to show that he rendered sundry statements and balance sheets which, without reference to the books of the boat, gave a satisfactory exhibition of the profits and losses and general finances.

" Plaintiff says he rendered accounts at the end of each trip ; that McFarland gave defendant a statement of what the boat had done ; that statements were forwarded, showing the difference between receipts and disbursements. Defendant, *contra*, says he never got anything like a full statement, although he asked for one repeatedly ; that Smith promised one, while in St. Louis, but, on account of his child's sickness, failed to give it. Defendant seems to have got a sort of statement, at New Orleans, of three trips up the Red river, which was made up in Jacobs' office while Smith was present. It appears that the books of the boat passed between Smith and Crews for two days, touching this statement. It was four or five pages of foolscap ; showed everything, Smith says, but was misplaced.

" Crews says the statements were garbled, and he refused to accept them ; that they were full of errors, which Smith admitted. These statements were attached together, marked ' Exhibit K 2,' and are herewith transmitted. They show that, on trip No. 1, the boat has earned $87.97 ; on trip No. 2, $294.33 ; on trip No. 3, had lost $479.05 ; afterwards another statement showed a loss of $1,396.50 on the same trip. The latter statement, Crews says, was grossly incorrect. The two *resumés* are about $900 apart. These papers might, perhaps, pass for statements, but not for accounts stated, upon which the business of plaintiff and defendants might be adjusted. So much for the Red river trip. As for the trip up to St. Louis, defendant testified that plaintiff told him the boat had made about $840, which would make her about even. After the boat arrived at St.

Louis, Crews says, everything was in confusion, plaintiff promising to straighten everything out if he got time ; that he demanded a settlement at Sioux City, and plaintiff promised to make one ; that Smith and McFarland made out one, showing a balance from Smith of $750 ; that Smith said he had in his hands only $500 ; this, defendant says, plaintiff admitted. Defendant says McFarland's and Smith's account differed about $250 ; that Smith did not then claim that the boat owed him a cent. Majors, the clerk, testified, in his deposition, that McFarland made out a statement for Crews, at Sioux City, about the 5th or 6th of July, and it showed a balance in Captain Smith's hands of $2,160, or $2,200, and that Crews and Smith were both present ; that Smith said the statement was wrong, but did not show in what particular ; that Crews frequently, at Sioux City, asked for a settlement, and Smith said he was not prepared to make it. Majors qualifies his statement somewhat as to cash in the boat, by adding that the money may have been paid out for the boat. Benjamin Jeffries says that, in obedience to written instructions from Crews and defendant Garner, he tried to get a statement of the affairs of the boat while in charge of Smith, but received nothing but a verbal statement, in which Smith said the boat was making money. As for the statements, they show certain summaries as to amounts collected for freight, passengers, bar rent, etc., and amounts expended for fuel, wages, and the like, but the statements are not accompanied by vouchers or items of any kind with which to verify the results."

From the foregoing *resumé* it will be seen that the testimony of plaintiff and that of defendants is irreconcilable.

The parties, in many things, flatly contradicted each other. The books are incompetent, and plaintiff swears that the books showed a proper statement of affairs ; whereas defendant and clerk, Majors, say they were incomplete and incorrect. According to Majors, a number of important items were left out of them altogether. So as to statements ;

plaintiff says they were full and satisfactory, while defendant and the clerks swear the other way. If testimony so conflicting proves anything, it would seem to show that, at the end of three trips on Red river, the boat owed Smith from $479 to $297, and a balance of $750 against plaintiff, on McFarland's settlement, at Sioux City. But no verdict could be found on the basis of such testimony as that herein given, touching the accounts between plaintiff and defendants. There is testimony—which, however, should perhaps be received *cum grano salis*—to the effect that plaintiff instructed one of the clerks, Majors, to keep the books falsely and fraudulently, in plaintiff's interest; that he made out sham vouchers for money represented to have been paid out by him, upon which entries were made by the clerk; that boat stores were traded for Indian wares and buffalo robes; that receipts were sometimes not accounted for; that moneys were used by plaintiff in gambling, etc.

But this testimony is so vague, vacillating, and contradictory as to be entitled to but little weight. The referee found some difficulty in passing upon the evidence in this case, but has come to the conclusion:

1. That plaintiff was bound, in the first instance, to show the balance claimed from the books of the steamer.

2. That he failed to make out such a case of loss, destruction, or removal, beyond his control, of the books of the boat, as to justify secondary or *ex parte* testimony touching his accounts and expenditures.

3. That his books, even, if admitted in evidence, would not show a complete exhibit of the steamer's finances.

4. That these deficiencies would not, so far as appears from the evidence, be remedied by proof as to the vouchers offered in evidence.

5. That the proof fails to show complete or satisfactory statements, or such as were accepted by defendants as correct, nor any admissions of an indebtedness, by letter or otherwise, to plaintiff on the boat's account.

The referee then proceeds to find that neither plaintiff nor defendant are entitled to receive anything on balance of the boat's account; but, in consideration that the services of plaintiff were rendered as captain, the referee finds a verdict for the amount charged by him for his services in this respect.

As to this the referee says : " It must be a case of gross misconduct which would prevent one in his position from recovering his salary."

The evidence in the case, as set out by the referee as the basis of his finding, the sworn statements of plaintiff himself, and the facts actually found by the referee, show a case of gross neglect on the part of the plaintiff which amounts to fraud in law.

An agent must keep an account of his payments and receipts. One of his most important duties is to render just accounts ; and if it appears affirmatively that an agent, managing the business affairs of another, did not keep regular accounts and vouchers, and that, by reason of this neglect, an account of his disbursements and receipts cannot be made out with any approach to accuracy, he will not be entitled to compensation. Any other rule would open wide the door to fraud.

Courts will go to great lengths in holding agents to the strictest fairness and integrity ; and in the case where agents have been allowed to recover without accounting, the facts show that the agent had been acting in transparent good faith, and that there was no possibility of fraud on the principal.

The finding of a referee stands as the verdict of a jury, and will not be set aside because it is against the weight of the evidence. Indeed, we will not weigh the evidence at all, and, where there is any evidence to sustain the verdict, we will suppose that the whole evidence was properly weighed, and the requisite effect given to it.

Where the evidence greatly preponderates against the

verdict, the trial court may grant a new trial; but, if it refuses to do so, this court cannot interfere, for such action is no error of law.

But when, as in this case, it is apparent, from the face of the report of a referee, that the decision is erroneous, it is error in the court below to confirm the report, and the judgment will be set aside.

It is insisted by respondent that a petition for review should have been filed in the court below, stating all the facts found as against evidence, and all the evidence to support them, and that, this not having been done below, it is not a matter for consideration here whether or no the facts warrant the finding of the referee. The decisions to which he refers as supporting this view are based upon provisions in the code of practice adopted in 1849, which are no longer in force.

From the evidence as detailed by the referee in his report, and from his finding of facts, it is quite clear that plaintiff, having kept no proper account of his receipts and disbursements, has been faithless to his first and most essential duty as the employee of defendants, and cannot, therefore, as a matter of law, recover for services rendered to them in a capacity which made the receipt and payment of moneys to large amounts one of his main duties.

The trial court, for this reason, should have set aside the report of the referee, and it was error not to do so. The finding of the referee and the judgment in this cause are therefore reversed, and the cause remanded. All the judges concur.